IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

YVONNE BOWENS-THOMAS,          )
                               )
      Plaintiff,               )
                               )
v.                             )     CASE NO. 2:16-CV-621-WKW
                               )           [WO]
ALABAMA COOPERATIVE            )
EXTENSION SYSTEM, *et al.*,     )
                               )
      Defendants.              )

## MEMORANDUM OPINION

Plaintiff Yvonne Bowens-Thomas brought this action against Alabama Cooperative Extension System ("ACES"), Auburn University ("Auburn"), Garry Lemme, Paul Brown, Celia Stovall, Stanley Windham, and Chris McClendon, alleging claims of unlawful race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and 42 U.S.C. § 1981, via 42 U.S.C. § 1983. (Doc. # 1.) Plaintiff later amended her complaint to include claims for disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Vocational Rehabilitation Act ("Rehabilitation Act") of 1973, 29 U.S.C. § 701, *et seq.* (Doc. # 37.)

Defendants moved for summary judgment on March 12, 2018. (Doc. # 44.) After consideration of the motion for summary judgment, the response, the reply,

and the evidentiary materials submitted by the parties, the court granted the motion for summary judgment on March 31, 2020, without stating the reasons for granting the motion. The court indicated that a memorandum opinion would follow at a later date. (Doc. # 71.) Consistent with the court's responsibility to "state on the record the reasons for granting or denying" a motion for summary judgment, Fed. R. Civ. P. 56, this memorandum opinion now follows.

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4). The parties do not contest personal jurisdiction or venue.

## II. STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material

fact.  *Id.*  Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . .  [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists.  *Celotex Corp.*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor.  *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III.  BACKGROUND

In 1994, Plaintiff began her employment with ACES, which operates as the primary outreach organization for the land grant functions of Alabama A&M and Auburn Universities.  (Doc. # 37 at ¶ 6; Doc. # 46-3 at 2, ¶ 5.)  Initially, she was hired as a 4-H Assistant County Agent assigned to ACES's Autauga County office. In 2005, she was appointed County Extension Coordinator ("CEC") of Autauga

County.  (Doc. # 46-3 at 2, ¶ 5.)  As a CEC, Plaintiff was responsible for, among other things, supervising and managing the county extension office; serving as the primary contact person with local governing bodies that provide funding; managing budgets, communications, human resources, and development; planning community programs to address educational priorities of the county and implementing those programs; ensuring that public relations within the county are positive; working to secure resources and supporting new programs; and serving as a member of the county 4-H team.  (Doc. # 46-3 at 10–16.)

While employed as a CEC with ACES, Plaintiff was supervised by Defendant Stanley Windham, ACES's Assistant Director for County Operations.  (Doc. # 46-3 at 2, ¶¶ 2–3.)  As Plaintiff's supervisor, Windham was responsible for Plaintiff's annual performance evaluations.  (Doc. # 46-7 at 30–38.)  In Plaintiff's 2013 performance review, Plaintiff was assigned an overall rating of four out of five, which meant that Plaintiff "[r]egularly exceeds job requirements and expectations." (Doc. # 54-5 at 9.)  The 2013 evaluation noted that Plaintiff could improve in teamwork and communication, which would "take her talent to a new level."  (Doc. # 54-5 at 9.)  In Plaintiff's 2014 performance review, which was completed in January 2015, Plaintiff was assigned an overall rating of three out of five, which meant that Plaintiff "[s]atisfactor[ily] and effective[ly] [] meet[s] expected levels of performance."  (Doc. # 54-5 at 13.)  The 2014 evaluation noted that there were

4

"several occasions" "where struggles with miscommunication or lack of trust hindered collegiality and teamwork." (Doc. # 54-5 at 13.) Plaintiff declined to sign the 2014 evaluation. (Doc. # 46-3 at 2, ¶ 6.)

In March 2015, an African American female administrative assistant for ACES's Autauga County office emailed Defendant Chris McClendon, Director of Human Resources and Strategic Partner Initiatives, and stated that she no longer wished to work in Autauga County. She also said in her email that, for fear of retaliation, she did not want Plaintiff to know about her desire to move positions until she was "seriously selected" for an interview. (Doc. # 52-1 at ¶¶ 2, 10.)

In April 2015, McClendon and Windham met with Plaintiff regarding her 2014 performance evaluation. During the meeting, Windham felt that Plaintiff refused to cooperate or address the concerns raised in the performance review. Windham gave Plaintiff until May 7 to present written responses to the concerns. (Doc. # 46-6 at ¶ 12.) On May 7, Plaintiff emailed Windham and stated: "This letter is in response to the document that you and Ms. McClendon provided to me on Tuesday, April 28, 2015. Upon receipt of an official document with your signature, there will be a response provided." (Doc. # 46-6 at ¶ 13.) It is unclear whether Plaintiff ever provided a written response. Windham subsequently asked McClendon to interview ACES employees in Autauga County "to get a better picture of the circumstances in that county" as it related to Plaintiff. (Doc. # 46-6 at ¶ 14.)

After speaking to the administrative assistant and Windham, McClendon began an investigation of Plaintiff's working relationships with her colleagues in Autauga County.  (Doc. # 46-6 at ¶ 11.)  McClendon reported that her investigation into Plaintiff's working relationships revealed that they were "seriously strained to the point of being unproductive."  (Doc. # 46-6 at ¶ 12.)

On June 2, 2015, Plaintiff was informed that she was being reassigned to another position with ACES.  (Doc. # 46-6 at ¶ 13.)  The new position—4-H Regional Extension Agent II ("REA") in Montgomery County—was chosen for Plaintiff because she had previously worked as a 4-H agent and had continued to excel providing youth programming in her role as Autauga County CEC.  (Doc. # 46-6 at ¶ 12; Doc. # 46-7 at 92–105.)  The job description of REA includes providing leadership, direction, organization, and implementation of leadership and workforce development 4-H programs; providing experiential learning opportunities for youth participants; and working collaboratively with the County 4-H team, other REAs, and State 4-H teams to support county 4-H objectives.  (Doc. # 46-1 at 14.)  According to ACES's "career ladder," REAs and CECs are listed as "equivalent positions."  (Doc. # 46-7 at 160–161; Doc. # 58-1 at 8; Doc. # 52-1 at ¶ 13.)  The reassignment did not change Plaintiff's salary or benefits.  (Doc. # 52-1 at ¶ 13; Doc. # 46-6 at ¶ 19; Doc. # 46-7 at 67–68, 160–161.)

**A.**     **Facts Related to Plaintiff's Discrimination and Retaliation Claims**

Plaintiff was reassigned to her current role as Montgomery County REA on June 15, 2015.  (Doc. # 46-7 at 63.)  Plaintiff believes that her reassignment was not based upon the performance issues alleged in her performance reviews and/or McClendon's investigation but, instead, was based upon the following:

In July 2013, ACES's Autauga County 4-H program's equestrian team used Confederate flags in their presentation at the state 4-H Horse Show.  (Doc. # 46-7 at 13–15.)  After Plaintiff was made aware of the incident, she emailed several ACES employees to report the issue. (Doc. # 46-7 at 39–48.)  After reporting the issue, Plaintiff asserts that Windham asked her to write a letter of apology on behalf of ACES to the citizens of Autauga County.  (Doc. # 46-7 at 22–30.)  Plaintiff refused because she felt she should not be responsible for writing the letter as she was not in charge of the horse club and was not aware that the flags would be used.  (Doc. # 46-7 at 22–30; Doc. # 54-3.)  Plaintiff contends that the act of asking her to write the letter was racial discrimination, notwithstanding the fact that she was the senior ACES employee assigned to Autauga County at the time the flags were flown.  (Doc. # 46-7 at 22–30.)

In December 2014, Plaintiff asserts that she was asked by Defendant Gary Lemme, Director of ACES, to apply for an equivalent position as CEC in Macon County.  (Doc. # 46-2 at 2; Doc. # 46-7 at 81–89.)  In early 2015, Defendant Paul

Brown, who was Windham's supervisor, met with Plaintiff and stated that she should consider becoming an REA.  (Doc. # 46-7 at 92–105.)  Brown told Plaintiff that she was good at programming, so he believed she would be a good REA.  (Doc. # 46-7 at 105–107.)

Plaintiff believes that her evaluation scores began to decline as a result of her complaints about the Confederate flag issue, and that the primary reason for this was Windham relying on complaints about her from other employees.  (Doc. # 46-7 at 107–122.)  Plaintiff was frustrated, felt bullied, and felt retaliated against because Windham continued to raise personnel issues with her despite having discussed the issues "previously and on numerous occasions, whether it was in [her] performance appraisal or just in general conversation."  (Doc. # 46-7 at 64–81.)

In her second amended complaint, Plaintiff alleges "there is a longstanding practice of discrimination against African-Americans by ACES, including examples of others in recent years[.]"  (Doc. # 37 at ¶ 22.)  Plaintiff lists the names of several individuals she believes have been discriminated against by ACES, such as Dr. Evelyn Crayton, Dr. Robert Drakeford, Mr. Mario Lightfoot, and Ms. Marie Harris.  (Doc. # 37 at ¶ 22.)  Plaintiff admits that she does not know any of the individuals she claims have been discriminated against, nor has she discussed their claims with them or how their claims were resolved.  (Doc. # 46-7 at 167–170.)

During a meeting on April 29, 2015, Plaintiff complained to Windham that she felt like she was being bullied, harassed, and retaliated against due to her complaints about the Confederate flag issue and other complaints about purported racial mistreatment.  (Doc. # 46-7 at 140–151; Doc. # 37 at ¶¶ 15–16.)  Plaintiff also states that she complained at other times of mistreatment to Windham, Brown, and Stovall.  Windham advised Plaintiff to go to Auburn's AA/EEO Office if she felt like she was being bullied, harassed, or retaliated against based upon being in a protected class.  Plaintiff never did so because she felt that "they all work on behalf of Auburn University. So why would I go to the very people I have a concern about?" (Doc. # 46-7 at 140–151.)

## B.   Facts Related to Plaintiff's ADA and Rehabilitation Act Claims

Plaintiff suffers from migraine headaches.  (Doc. # 37 at ¶ 24.)  Plaintiff claims that, without being provided a reasonable accommodation for her headaches, she was forced to attend a 4-H summer camp in June 2016.  (Doc. # 37 at ¶¶ 24–26; Doc. # 46-7 at 179.)

Sometime prior to June 2016, Plaintiff came to believe that something "environmental" at the 4-H Center located in Columbiana, Alabama, induced her cluster migraine headaches.  (Doc. # 46-7 at 179–181.)  On June 9, 2016, Plaintiff emailed her supervisor, Dr. Molly Gregg, ACES's Assistant Director for 4-H Programs, about attending an upcoming 4-H summer camp session at the

Columbiana Center.  (Doc. # 46-1 at ¶ 10.)  In the email, Plaintiff confirmed that she would be attending the summer camp, but advised that she has "a severe medical condition that is triggered by the environment[al] conditions at the Alabama 4-H Center."  (Doc. # 46-1 at ¶ 10, Attach. 4.)  After reading the email, Gregg contacted Kelley Taylor, Director of Auburn University's AA/EEOC Office, and asked if she should inquire of Plaintiff whether she needed an accommodation.  (Doc. # 46-1 at ¶ 11, Doc. # 46-7 at 184; Doc. # 46-5 at ¶¶ 3–4.)  Taylor sent Gregg links to forms for requesting a reasonable accommodation and for obtaining medical verification in support of a request for reasonable accommodation.  (Doc. # 46-5 at ¶ 5.)  Gregg then sent the links for the forms to Plaintiff.  (Doc. # 46-1 at ¶ 11; Doc. # 46-5 at ¶ 5.)

Plaintiff submitted her request for reasonable accommodation form to the AA/EEO office at 5:36 p.m. on June 14, 2016, and submitted her medical verification form at 1:02 p.m. on June 15, 2016.  (Doc. # 46-5 at ¶ 6, Attachs. 1, 2.)  Later in the afternoon on June 15, 2016, Plaintiff called the AA/EEO Office and spoke with Taylor.  During the call, Plaintiff asked if she was required to attend summer camp.  (Doc. # 46-7 at 227–228; Doc. # 46-5 at ¶ 6.)  Taylor asked if attendance at the camp was an essential function of her job, and Plaintiff responded no.  Taylor then explained the process of accommodation to Plaintiff and told Plaintiff that they would need to schedule a time to meet.  Plaintiff informed Taylor

that she was already in her car and on the way to the camp, and wanted to know if her boss could require her to go.  Taylor informed Plaintiff that she was not in a position to say whether or not she had to go.  Plaintiff then responded:  "So you are telling me that Auburn University is saying I have to go?"  Taylor replied:  "No, I'm not telling you that Auburn University is saying that you have to go.  What I'm saying is that's a call you'll have to make yourself because we haven't had time to evaluate your request for accommodation since we just received your forms today." (Doc. # 46-5 at ¶ 6, Attach. 3.)

Plaintiff decided to attend the camp and concedes that the AA/EEO Office did not tell her that she had to go to the camp.  (Doc. # 46-7 at 229.)  At the camp, Gregg, on her own initiative, gave Plaintiff a hotel room to accommodate her condition, but Plaintiff did not agree that it was the "right thing to accommodate [her]."  (Doc. # 46-7 at 225–227.)  Plaintiff became ill the second night of the camp due to a migraine.  (Doc. # 37, ¶ 27.)

## IV.  DISCUSSION

**A.      Title VII and § 1981 Claims[1]**

Because Plaintiff relies on circumstantial evidence of discrimination and retaliation to prove her claims, the claims must be analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To prove a *prima facie* case of race discrimination under Title VII and 42 U.S.C. § 1981, Plaintiff must prove that "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." *Burke-Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 (11th Cir. 2006).  If Plaintiff satisfies these elements, ACES must provide a legitimate, non-discriminatory reason for its employment action.  *Id.*  Upon that showing, Plaintiff must prove that the proffered reason is pretext for unlawful

---

[1] Plaintiff brings her race discrimination claims pursuant to Title VII and 42 U.S.C. § 1981, via 42 U.S.C. § 1983.  While separate claims, the Eleventh Circuit requires the same proof and the same analytical framework to determine the validity of the claims.  *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (stating that Title VII and § 1981 "have the same requirements of proof and use the same . . . analytical framework").  Plaintiff also brings retaliation claims pursuant to Title VII and 42 U.S.C. § 1981.  "Absent direct evidence of discrimination, when analyzing claims for race-based retaliation brought under § 1981, [the Eleventh Circuit] employ[s] the tripartite analytical framework developed by the Supreme Court in *McDonnell Douglas* [] and subsequently modified in . . . *Burdine*[.]"  *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009).  Plaintiff has not presented direct evidence of retaliation; therefore, all of her Title VII & § 1981 claims can be analyzed together.

discrimination.  *Id.*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973).

It is not necessary to decide whether Plaintiff has met the elements of her *prima facie* case[2] because it is clear that she has not provided sufficient proof of pretext to rebut ACES's proffered reason for the reassignment.

In order to show pretext, a plaintiff must "introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006). To do so, a plaintiff must "demonstrate that the [employer's] proffered reason was not the true reason for the employment decision . . . either by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  In evaluating a summary judgment motion, "[t]he district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation*

---

[2] "A *prima facie* case of retaliation under Title VII requires the plaintiff to show that:  (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)).  Because Plaintiff has failed to show pretext, the differences at the *prima facie* stage are immaterial.

*Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotations and citations omitted).  A reason is not pretextual "unless it is shown both that the reason is false, and that discrimination was the real reason."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).  "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."  *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

ACES states that it reassigned Plaintiff because of "complaints over the course of several years" and its perception that Plaintiff "lacked the ability to work well with others and to be professional."  (Doc. # 45 at 36.)  Plaintiff argues that her reassignment instead "was motivated by a racially discriminatory intent," (Doc. # 54 at 10), or by retaliation.  As evidence of pretext, Plaintiff argues that (1) during ACES's investigation of Plaintiff, "several employees indicated they did not have a problem working with Plaintiff" and "believed she was a hard worker"; and (2) in 2013, Plaintiff received a rating of "4" on her annual performance review, but, after

14

the Confederate flag incident and after Plaintiff's complaints of race discrimination, she received a rating of "3" in 2014 without justification.  (Doc. # 54 at 12–13.)

As evidence that discrimination or retaliation was the true reason for the reassignment, Plaintiff states that "[i]t is most notable that Plaintiff [] was transferred from a predominately white populated county (Autauga) to a predominately African-American populated county (Montgomery)."  (Doc. # 54 at 10.)  She also asserts that there are "multiple examples of racial bias exhibited by ACES and its administration towards her."  (Doc. # 54 at 10.)  Plaintiff points to these examples, which she believes to be "sufficient evidence for a jury to decide whether or not ACES['s] decision to reassign Plaintiff [] was due in part to her African-American race."  (Doc. # 54 at 12.)  Her examples include:

1.    ACES's request that Plaintiff write an apology letter to the citizens of Autauga County for the Confederate flag that was displayed at the 4-H club state horse show.  (Doc. # 54 at 12.)  Plaintiff feels that the request "was the proverbial 'insult added to injury' for an African American who had no involvement whatsoever with the incident."  (Doc. # 54 at 10.)

2.    In relation to the Confederate flag incident, Windham asked Plaintiff if "her friends" complained about the flag.  (Doc. # 54 at 10.)  At that time, Plaintiff indicated to Windham that "she believed she was being subjected to discrimination on the basis of her race."  (Doc. # 54 at 10–11.)

15

3.     During late 2014 and throughout 2015, Plaintiff made several complaints to ACES's administration that she was being singled out and treated differently than other ACES employees because of her race.  After Plaintiff voiced those complaints, Windham suggested Plaintiff contact Stovall, who is an African-American, for the purpose of mentoring Plaintiff.   Plaintiff believes that, in suggesting Plaintiff contact Stovall for mentoring, Windham was implying that Plaintiff "would be more comfortable with Stovall because Stovall was also an African-American."  (Doc. # 54 at 11.)  Plaintiff finds her belief supported by the fact that, around this same time, Windham "brought up the Confederate flag issues, even though the incident had occurred two years earlier."  (Doc. # 54 at 11.)

4.     Dr. Gary Lemme, Director of Extension for ACES, asked Plaintiff to apply for a position in Macon County, which is a county "well known for being populated predominately by African-Americans."  (Doc. # 54 at 11.)  Plaintiff believes that if she had the job performance issues that were alleged, her insufficiency for performing that position in Autauga County, a predominately white county, should disqualify her from performing that same position in Macon County. (Doc. # 54 at 11.)

None of Plaintiff's evidence shows "any weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in ACES's reasoning. *See Combs*, 106 F.3d at 1538.  Plaintiff's evidence of pretext centers on whether *she* believed

her annual review scores to be justified and whether *she* perceived her office relationships to be productive.  This evidence does not "meet [ACES's] reason head on and rebut it."  *See Chapman*, 229 F.3d at 1030.

First, whether Plaintiff had good working relationships with some colleagues does not mean that she did not have strained working relationships with others—or that some employees at least reported strained relationships with her to ACES, regardless of whether those reports were true.  ACES has provided evidence that it received reports of strained relationships, and Plaintiff has provided nothing to rebut that evidence.  The record does not contain any indication that ACES did not believe that Plaintiff was struggling in her interpersonal abilities.

Second, even assuming that Plaintiff's lower marks on an annual performance review were a causal factor in her reassignment, mere speculation of racial motivation is not sufficient to support a finding of discrimination.  The lower scores were supported by reports of communication problems and interpersonal problems, and this court will not reassess an employee's annual review based on a mere suspicion of racial motivation.  *Id.*

Plaintiff's other evidence is unhelpful for two reasons.  First, it is only Plaintiff's suspicion that the comments and requests made to her were made because of her race.  There is nothing inherent in the comments or requests that implies that they were made because of Plaintiff's race.  Second, even if the comments were

17

made with Plaintiff's race in mind, there is no evidence indicating that this consciousness of Plaintiff's race was a factor in her reassignment.  Evidence of disparate treatment, for example, is not evidence that the employer's proffered reason was false.  *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1313 (11th Cir. 2018); *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012). Even where there is a known discriminatory animus in play, the employee still has the burden of proving that the discriminatory animus was "an actual cause of the . . . decision."  *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999).

None of Plaintiff's evidence shows that ACES's proffered reasons were false, and none of her evidence shows that racial discrimination or retaliation was the true reason for her reassignment.  Plaintiff therefore fails on both sides of the pretext analysis.  *See Hicks*, 509 U.S. at 515.  The evidence demonstrates only that ACES believed Plaintiff was having interpersonal problems and that it made the reassignment in response to that belief.

Plaintiff's race discrimination and retaliation claims under Title VII and 42 U.S.C. § 1983 are therefore insufficient because she has failed to provide sufficient evidence of pretext.

**B.     ADA and Rehabilitation Act Claims[3]**

The Eleventh Circuit recently provided a summary of the elements of a claim

brought under the Americans with Disabilities Act or the Rehabilitation Act:

> In order to recover under [the Americans with Disabilities Act or] the
> Rehabilitation Act, a plaintiff must establish:   (1) that [s]he is a
> qualified individual with a disability, (2) that [s]he was excluded from
> participation in or denied the benefits of the services, programs, or
> activities of a public entity or otherwise discriminated against by such
> entity, (3) by reason of such disability.  Of course, the duty to provide
> a reasonable accommodation is not triggered unless a specific demand
> for an accommodation has been made.  Additionally, a plaintiff seeking
> compensatory damages must show that the lack of accommodation was
> due to intentional discrimination or bad faith and must show that injury
> resulted from the lack of accommodation.

*Charles v. Johnson*, 18 F.4th 686, 702–03 (11th Cir. 2021) (citations omitted)

(quotation marks omitted).

Plaintiff's claim fails on multiple elements.  First, "cluster headaches" are not

an automatically qualifying disability.   A "disability" is "a physical or mental

impairment that substantially limits one or more major life activities." *See* 29 U.S.C.

§ 705(9)(B) (cross-referencing 42 U.S.C. § 12102).  "[M]ajor life activities include,

but are not limited to, caring for oneself, performing manual tasks, seeing, hearing,

eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning,

reading, concentrating, thinking, communicating, and working."   42 U.S.C. §

---

[3] "Discrimination claims under the Rehabilitation Act are governed by the same standards used in [cases founded upon the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*]." *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) (citing 29 U.S.C. § 794(d)).

12102(2)(A).   In order to prove a disability, Plaintiff must identify a major life activity and explain how her headaches substantially limit that life activity.  *See Charles*, 18 F.4th at 703.  Plaintiff did not do so, and her claim therefore fails.

Second, and perhaps most important, Plaintiff has not demonstrated that the provided accommodations were unreasonable.  Plaintiff's proposed accommodation was eliminating summer camp attendance as a requirement of her position.  "While it is true that the ADA may require an employer to restructure a particular job by altering or eliminating some of its marginal functions, employers are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists."  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001).  Contrary to Plaintiff's statement to Taylor on June 15, 2016, ACES has provided evidence that the REAs were necessary for conducting the summer camp that that REAs must attend the summer camp in order to meet annual requirements.  There is no evidence that the summer camp was simply a marginal function.   Eliminating the summer camp was therefore not a reasonable accommodation.

The request for accommodation was doubly unreasonable in its timing.  While an emergency request for accommodation could certainly be reasonable under some circumstances, the undisputed evidence shows that Plaintiff knew of the headache issue for a significant period of time prior to her last-minute request.  A requested

20

accommodation can only be reasonable if the employer is given a reasonable time to implement it.

Lastly, Plaintiff was provided with a hotel room while she attended the camp. Although she did not agree that this was the correct accommodation in her deposition, "a reasonable accommodation need not be perfect or the one most strongly preferred by the plaintiff." *Wright v. N.Y. State Dep't of Corrs.*, 831 F.3d 64, 72 (2d Cir. 2016) (quotation marks omitted) (alteration adopted). If the accommodation was ineffective, ACES's actions still do not amount to "intentional discrimination or bad faith" unless Plaintiff made ACES aware that the accommodations were ineffective and proposed a reasonable alternative. There is no evidence that she did so.

Plaintiff's ADA and Rehabilitation Act claims are therefore insufficient because she has failed to provide sufficient evidence that she was disabled or that she was denied a reasonable request for accommodation.

## V.  CONCLUSION

For the above stated reasons, summary judgment in favor of Defendants was granted on March 31, 2020.

A final judgment will follow.

DONE this 2nd day of March, 2022.

＿＿＿＿/s/  W. Keith Watkins＿＿＿＿
UNITED STATES DISTRICT JUDGE
